(62 App. Div. 572.)

### MYERS v. METROPOLITAN LIFE INS. CO.

(Supreme Court, Appellate Division, Third Department. June 28, 1901.)

INSURANCE—RELEASE OF CLAIMS—FRAUD—EVIDENCE.

Plaintiff was the beneficiary under two of defendant's life policies, and insured's husband was the beneficiary under a third. The policies were in the possession of the insured until her death, and in the proofs of loss her husband was named as claimant under all three. Defendant's agent met the plaintiff and the insured's husband, to pay the claims, and each beneficiary executed a sealed release to the company for the amounts due; and a check to the order of insured's husband and the plaintiff was indorsed by the latter, and delivered to the former, who received the benefit thereof. Plaintiff testified that the agent asked her to sign the release and the check, and that her daughter inquired why she was to sign it, and the agent replied, "Merely for nothing." Plaintiff testified that she did not have her glasses, and could not see the papers; that she did not know one of them was a release; and that she had never seen a check before, but supposed they had something to do

with the policies. *Held*, that the evidence was insufficient to show fraud on the part of defendant's agent in procuring the release.

Appeal from trial term, Rensselaer county.

Action by Julia Myers against the Metropolitan Life Insurance Company to set aside a release to defendant for amounts due under a policy. From a judgment in favor of plaintiff, and from an order denying a motion to set aside the verdict and for a new trial, defendant appeals. Reversed.

The plaintiff was the beneficiary under two policies issued by the defendant on the life of the plaintiff's sister, Catharine Lynch, formerly Catharine Donovan, who died January 1, 1899. One of the policies was issued on April 9, 1883, for $116, and the other on December 22, 1884, for $53. The name of the plaintiff as beneficiary appeared in the applications, and not in the policies. Plaintiff paid the premiums on these policies for three or four years, until the marriage of her sister, ten or twelve years before her death, to John Lynch, when the policies with the books containing the receipts for premiums were delivered to the insured, who thereafter paid the premiums. At the time of her death the policies were in the possession of her husband. After Catharine's marriage with Lynch, another policy was issued by the defendant, on April 4, 1892, for $70, on her life, in the application for which her husband was named as beneficiary. On January 2, 1899, proofs of death were made by John Lynch, the husband of the insured, as the claimant of the amount due on these three policies. On the receipt of the proofs the company instructed its superintendent at Troy, N. Y., where the plaintiff and John Lynch resided, to make the check for the amount due on the three policies payable to the order of the plaintiff and to John Lynch, and to obtain a release from both. On January 5th, at a meeting of the defendant's agent with the plaintiff and John Lynch at the house of Lynch, the plaintiff and Lynch each executed a sealed release to the company for the amounts due under these three policies; and a check to the order of Lynch and the plaintiff for the amount due on the three policies was indorsed by the plaintiff and delivered to Lynch, who received the benefit of the same. Thereafter this action was brought by the plaintiff to set aside the release as to her, and to recover the sum of $169, the amount of the two policies in which she was beneficiary, on the ground that the release and her indorsement of the check were procured from her through the fraudulent representations of the defendant's agent. The court submitted to the jury the following questions: First. "Was the plaintiff induced to sign the release or receipt and indorse the check in evidence by the false representation of Bernard T. Dooley, the agent of defendant, without knowledge on plaintiff's part of the nature of the papers she was signing?" Second. "Was the check in evidence ever delivered by defendant, its agents or servants, to the plaintiff?" The jury answered the first question in the affirmative, and the second in the negative. The trial court made a decision adopting the findings of the jury, and directing a judgment for the plaintiff, and from the judgment entered thereon this appeal is taken.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

John Dewitt Peltz and Martin T. Nachtmann, for appellant
John W. Roddy, for respondent.

EDWARDS, J. The defendant having paid in full the amount of the policies in question, and the plaintiff having executed a release of all claims under the policies, the effect of the release cannot be destroyed, and the defendant be again compelled to pay, unless a fraud has in fact been committed by the defendant, which induced the execution of the release. The facts attending the execution of

the release and the delivery and indorsement of the check are substantially as follows: On the evening of January 5, 1899, Mr. Dooley, an assistant superintendent of the defendant, accompanied by Mr. Westfeldt, another agent of the defendant, went to the residence of John Lynch, in Troy, for the purpose of paying the claims under the two policies in question, and the one held by John Lynch. They there met the plaintiff, her daughter, Lynch, and his two sons. The plaintiff says that her relations were at that time friendly with her brother-in-law, Lynch, who, in the proofs of death, signed by him, was named as the claimant of the amount due under these three policies. She says she knew that Dooley was assistant superintendent of the defendant, and knew his business there; that she knew there were three policies upon the life of her deceased sister, and knew that two of them were payable to her at her sister's death; that she had never given any consent to a change of the policies, never heard of any change being made, and that none ever was made, and she understood that these two men from the defendant had come to pay the money. She says, "I didn't know of any other business that Mr. Dooley would have, except in relation to those policies;" "I supposed we were going to get something." The plaintiff says that when she went into the room Dooley asked her to sign the two papers that he had there,—the release and the check,—and that her daughter said, "What right has she got to sign this paper?" and Dooley said, "Merely for nothing." She says that she could read and write, but that, she said, "I didn't have my glasses, and couldn't see;" that she signed her name, and did not know that the paper was a release; had never seen a check before, and Dooley did not say what the papers were; that she signed them both, one after the other; and says, "I supposed, certainly, they had something to do with these insurance policies." She says that her daughter told her several days after this occurrence that the policies were to her; and says, "I knew that before;" that after she signed the papers Lynch got them; that Mr. Dooley took the papers first, after she signed them, and handed them to Lynch. This is all the testimony of the plaintiff as to what was said and done there on that occasion. The testimony of the plaintiff's daughter as to the occurrences at that time is, in substance, the same as the mother's, except that she adds that Mr. Lynch said, "What has your mother got to do with my business?" and the daughter said, "What right has she got to sign those papers, then?" She says that her mother did not ask what the papers were. The plaintiff's daughter, who was present, was educated in the public schools of Troy. The defendant's witnesses deny that Dooley said, in answer to the daughter's question, "Merely for nothing," and also say that the daughter read and examined the release and the check, and then told her mother to sign them.

Assuming the testimony of the plaintiff and of her daughter to be correct, I think the evidence is quite insufficient to support a finding that a fraud was committed by the defendant. There was no fraudulent representation or concealment of any fact by the defendant's agent, nor was any artifice used by him to induce the plaintiff not to read the release and the check. Indeed, no conceivable motive ap-

pears for the perpetration of a fraud.   The defendant was willing to
pay the full amount due under the policies to the person entitled, and
the agent had no personal interest in withholding it from the plain-
tiff.   The only statement made by the agent which is claimed by the
plaintiff to be fraudulent are the words, "Merely for nothing," in an-
swer to the question put to him by the defendant's daughter.   The
significance of these words is not readily understood,—indeed, can
only be conjectured.   But it is quite clear that they cannot be con-
strued as a fraudulent representation of any fact.   They were not a
misstatement of the contents of the release which the plaintiff was
asked to sign, nor of the check which she indorsed.   It is not claimed
by the plaintiff that she made any inquiries as to the nature of the
release or of the check, and, if the agent did not inform her of their
contents, he did not thereby fail in any duty which he owed to her.
It is not disputed that there was ample time and opportunity for the
plaintiff to read these papers, or to have them read to her by her
daughter, who is an intelligent woman.   If she had done so, she
would undoubtedly have understood their significance; and, if she
failed to do so, she alone must suffer the consequences of her want
of vigilance.   Furthermore, the agent might reasonably assume that
the plaintiff understood the nature of the business which was being
transacted, and the character and effect of the papers she signed.
The agent would naturally assume that she understood the settle-
ment to relate to policies in which she, as well as Lynch, was inter-
ested.   He would not naturally suppose that she believed it necessary
for her to execute papers in settlement of a policy held by Lynch
alone, and in which it was not claimed by her or by any other person
that she had the slightest interest.   Nor can it be said that she relied
on the existence of any relation of confidence or trust between her
and the defendant's agent.   No such relation can be claimed to have
existed.   In the absence of any misstatement of the contents of the
check and of the release, or of artifice to induce the plaintiff not to
read them, the plaintiff cannot maintain her action.   The law would
afford but poor protection to the holder of a sealed release if its ef-
fect could be destroyed, and he be again compelled to pay, under cir-
cumstances such as these.   Indeed, there would be but little safety
for men in the transaction of their ordinary business affairs.

The judgment and order should be reversed, and a new trial granted.

Judgment and order reversed on law and facts, and new trial granted, with
costs to appellant to abide event.   All concur.